WILLIAM T. HAMILTON, Governor of Maryland *vs.*
THE STATE OF MARYLAND, ex rel. GEORGE WELLS
and JAMES A. HARDESTY.

*Section 30, of Article 3, of the Constitution—Bill passed by*
*the General Assembly—Great seal of the State—Right of the*
*Governor in respect of a Bill not sealed.*

As the Constitution requires that every bill when passed by the
General Assembly shall be sealed with the great seal of the State,
before it be presented to the Governor, he has the undoubted right
to refuse to consider it, if it be presented not so authenticated.

APPEAL from the Circuit Court for Anne Arundel
County.

This was an application by the State on the relation of
George Wells and James A. Hardesty for a mandamus to
compel the Governor of Maryland to deposit in the office
of the Court of Appeals a certain bill alleged by the re-
lators to be a law under the provisions of section 17 of
Article 2, of the Constitution, and improperly withheld.
The petition of the relators stated that they were resi-
dents in, and citizens of, Anne Arundel County, and had
an interest in the protection of the oyster beds of said
county and in the enforcement of the laws pertaining to
the same; that the relator, Hardesty, was an oysterman,
and derived his support from the catching of oysters, and
was therefore more especially interested in the protection
of the oyster beds in said county. The petitioner Wells,
represented that he, as the Senator from Anne Arundel
County, introduced a bill to provide an additional sloop for
the oyster service in the waters of Anne Arundel County,
which bill was entitled "An Act to repeal and re-enact sec.
26 of chap. 198 of the Acts of 1880, entitled an Act to re-

peal chap. 181 of the Acts passed at the January Session, 1874, being an Act to repeal Art. 71 of the Code of Public General Laws entitled 'Oysters,' as amended and re-enacted by chap. 364 of the Acts passed at the January Session, 1870, and also chap. 167 of the Acts passed at the January Session, 1872, and to re-enact the same with amendments, and add additional sections thereto," the same being No. 147 of the Senate bills of the session of 1882. And the relators represented that the said bill, after duly passing the Senate and House of Delegates of Maryland, was, in the manner usual and customary presented to the Hon. Wm. T. Hamilton, Governor of Maryland, for his approval or disapproval, at the Executive Chamber, in the State house, on Friday, the 24th day of March, 1882 ; that the said bill had remained in the possession of the Governor, or his agents, from that day to the present time ; and that the Legislature did not adjourn until Monday, the 3d day of April, 1882 ; and that the bill aforesaid was in the possession of the Governor, or his agents, for nine days, or more, before the adjournment of the Legislature. The relators further represented that the Constitution of Maryland, declares in sec. 17, Art. 2, that "if any bill shall not be returned by the Governor, within six days (Sunday excepted,) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly shall, by adjournment, prevent its return, in which case, it shall not be a law ;" that the said bill was in the possession of the said Hon. Wm. T. Hamilton, Governor of Maryland, for more than six days, (Sunday excepted,) and that the Legislature did not adjourn within that time, and that therefore, the said bill is now a law under the aforesaid provisions of the Constitution of the State.

The Governor filed his answer to the petition. He admitted that a bill bearing the title set forth in the petition, and professing to provide an additional sloop for the oyster-

service, in the waters of Anne Arundel County, was passed by the General Assembly at its last session. But the respondent denied that said bill, passed by the General Assembly, had ever been presented to him for approval, or disapproval; but on the contrary, that said bill so as aforesaid passed remained, and still continued to remain in the archives of the General Assembly, or in possession of some of its officers, and had never been out of the possession of the same, and that the said bill alleged to have been presented to the respondent, was but a copy of said bill so as aforesaid passed by said General Assembly, and still remaining among its archives, or in the possession of some of its officers, and never presented to respondent as aforesaid. The respondent averred that of right, he was entitled to have for his consideration and approval, the original bill as engrossed, read a third time, passed and authenticated, as prescribed and required by the Constitution, the laws and rules regulating the proceedings of the Senate and House, and no other bill, or copy of any bill, or other paper purporting to be a bill, could or ought to be, of legal right, presented to the respondent, as Governor, for his consideration and approval; nor was he upon any such presentation required by the Constitution and laws, to give to the same any consideration whatever, or to recognize the same as a legal or valid instrument for official action.

The respondent further stated that the alleged bill, or copy, was not presented to him on the 24th day of March, 1882, as alleged, but that the same was presented to him on the 30th day of March, 1882, and not at any time before except in the manner following, as the respondent was advised: That a certain John Ireland, holding the position of engrossing clerk in the Senate, did on or about the 24th day of March, 1882, take to the Executive Chamber in the Capitol, the alleged bill, or paper, and laid the same upon the desk used by the Secretary of State, who was

then absent from said chamber, as was also the respondent, who was then, and for some time before, had been confined by sickness at the Executive Mansion, and unable, by reason thereof, to be at said chamber, and leaving said bill, or paper, on said desk, left the said chamber; whereupon, Samuel W. Brooks, holding the place of messenger to the Executive, and without any authority to receive bills for, or on behalf of the respondent, as Governor, and who was then and there present, took and locked up the said bill in the said desk; that the alleged bill remained locked up until the 29th of March, thence following, when said Brooks brought the same to the Executive Mansion, but did not see the respondent, who was still confined by sickness; and that on the morning following being the 30th day of March, 1882, said Brooks brought said bill or paper to the room in the Executive Mansion, where the respondent was, and there delivered the same to him, and not at any time before had he seen said bill, or paper, nor had any knowledge, whatever, of any such bill having passed the General Assembly, or of having been carried to the Executive Chamber, in the Capitol, and left there as aforesaid.

And the respondent further stated that when said bill or paper was delivered to the respondent by said Brooks, on the 30th of March as aforesaid, the respondent at once observed the endorsement on the back thereof, purporting to be signed by John M. Miller, the Secretary of the Senate, and representing that the same was presented to the respondent on the 24th day of March, 1882, and the respondent well knowing the effect thereof if true, and knowing that the same was not true, forthwith sent for the Secretary of State, and directed him to take said alleged bill or paper to the proper officer of the Senate, where the same originated, and make request that the false date of the alleged presentation as endorsed on said bill or paper, be altered to the true time, to wit, the 30th

day of March, in the place and stead of the 24th day of March. And the respondent was advised that said Secretary of State did request Mr. John Ireland to correct said date, and that he refused so to do, and that said bill was accordingly returned to the respondent by the Secretary of State, unchanged in said date, and so remained in the possession of the respondent until some days after, when the presiding officers of both Houses, together with the Secretary of the Senate and the Chief Clerk of the House, were in attendance before the respondent as Governor of Maryland, at the Executive Mansion, and who was still there confined by continuous sickness, to witness the approval of bills theretofore passed by the General Assembly, and that then and there, in the presence of the said presiding officers of both Houses, the respondent called attention to the erroneous date on said endorsement of presentation, and requested John M. Miller, the Secretary of the Senate, to correct the same, and accordingly the said John M. Miller, as Secretary aforesaid, then and there in the presence of the officers aforesaid, changed said date from the 24th day of March, to the 29th day of March, so that by said endorsement, so as aforesaid changed, and as it now appears upon the back of said alleged bill or paper, the presentation thereof, is the 29th day of March, 1882.

And the respondent further said, that the alleged bill or paper was then among the archives of the Executive Department, according to the custom and usage in such cases, the same having been presented within six days before the General Assembly adjourned, and not being approved or returned with the objections thereto, before said adjournment, even conceding that the presentation to the Governor of an engrossed copy of a bill, passed by both Houses of the General Assembly, is a presentation within the meaning and requirements of the Constitution ; and that said General Assembly adjourned on the 3rd day of April, 1882, *sine die,* and that the said bill or paper, having been

presented to the respondent for consideration and approval, within six days before the said adjournment, the respondent, as Governor, had the constitutional right and power to withhold such approval, and thereby prevent the same from becoming a law.

And the respondent further said, that the alleged bill or paper, purporting to be a bill, never was, and was not then, sealed with the great seal of the State, as required by section 30 of Article 3 of the Constitution, and did not come to the respondent authenticated by the highest required forms of law, verifying the same to be the true bill as passed by the General Assembly, and by reason thereof, was not in law, or in right, in a fit form to be presented to the Governor, nor was the respondent, as Governor, required to give to it any consideration whatever.

A demurrer was filed to portions of the answer, and a general replication entered to the residue. The Court (MILLER, J.,) sustained the demurrer. By agreement of counsel the issues of fact raised by the pleadings in the case were submitted to, and tried before, the Court, without the intervention of a jury. The respondent submitted sixteen prayers or legal propositions, all of which were refused except the fourteenth, which was granted. The respondent excepted. The *mandamus* was ordered as prayed. The respondent appealed.

The cause was argued orally before ALVEY, STONE, IRVING, and RITCHIE, J., and re-argued on notes, when ROBINSON and BRYAN, J., participated in the decision.

*Phil. H. Tuck,* and *William H. Tuck,* for the appellant.

Presentation to the Governor in person is necessary, or at least, there must be brought home to him actual knowledge of the fact or act of presentation, of which there is not a particle of proof in the record. Assuming that the Governor was in full health from March 3rd to April 4th,

the facts relied on by the petitioners do not make the presentation contemplated by the terms of the Constitution, because the duty imposed upon him, is a personal duty, confided to him alone, which, of necessity, must be exercised by him personally; so far from that being the case here, the Governor never saw this bill, nor heard of it until the morning of March 30th, and no valid presentation could have been made on the 24th, because the intention of the framers of the Constitution was, "to guard against hasty or partial legislation and encroachments of the Legislative Department upon the co-ordinate Executive and Judicial Departments." How can this conservative power be exerted, if the Executive has no knowledge of the subject or object of the legislation proposed, and, through no dereliction on his part, is denied all opportunity to consider the bill, that he may give that protection to the people, which was intended to be afforded when the Constitution imposed upon the Executive this high duty? This is the great principle in the case, leaving aside every consideration of the expediency or inexpediency of this particular legislation. 99 *Mass.*, 638; *Part* 2, *chap.* 1, *sec.* 1, *Art.* 2 *of the Constitution of Massachusetts.*

Presentation cannot be made by leaving the bill either with the Secretary of State, or messenger to the Executive, or by placing the bill on the desk of the Secretary of State, even if the Governor be not sick, and necessarily absent from the Executive Chamber.

It is maintained by the relators that this clause of the Constitution was gratified when Mr. Ireland, the engrossing clerk to the Senate, during the business hours of March 24th, 1882, left the bill on the desk of the Secretary of State in his absence, and in the absence of the Governor, for whom he made no inquiry, requesting the messenger of the Executive to call the Secretary's attention to the bill, upon his return, which Brooks promised to do.

The functions of the three great co-ordinate departments of the State Government can be exercised only by

them respectively; the idea of an agency, as suggested in the petition, in respect to either, cannot be entertained. The Judges cannot deputise others to perform their duties, and with as little reason can it be said that the law-making power rests in any other body than the Legislature, subject, however, to a qualified negative in the Executive, which he at times could not exercise, if a presentation to any one else is that presentation intended by the framers of the Constitution. If so, then to the extent of this qualified negative, the law-making power would be vested in some other person or persons than the Legislature and Executive, which conclusion is absurd upon its statement.

Clearly, then, there is nothing upon the face of the Constitution relating to the office of Governor, which would permit this personal trust to be delegated to another; nor did the Governor, by any act of his, confer authority to receive bills, either upon the Secretary of State, as the Governor himself testifies, or upon the messenger, as the Governor also testifies, and Mr. Brooks admits.

The authority to receive bills, in the sense that a presentation to the Secretary of State is a presentation to the Governor, is not conferred by the single clause of the Constitution, which, in plain language, defines all the duties of that officer. *Art.* 2, *sec.* 23, *of the Constitution.*

The office of messenger to the Executive is unknown to the Constitution, and the only reference thereto, is found in Art. 6, sec. 24, of the Revised Code.

It would seem hardly to admit of argument that the mere leaving of the bill on the desk of the Governor or Secretary of State, during the business hours of the day, is not the presentation required by the Constitution, unless the Governor have actual knowledge that the bill was placed there for the purpose of presentation.

The bill was left at the Executive Chamber March 24th, when the illness of the Governor, during all that month,

was notorious. Granting now, for the argument, that a presentation to the Secretary of State, as shown in the record, (provided there were no circumstances from which to infer that the Governor's absence might be caused by sickness,) would be sufficient to satisfy the Constitution, a very different rule must prevail, when, at that very time in point of fact, he was confined to the house, and his sickness known to Mr. Ireland—and, indeed, generally known. It must be presumed that the illness of the Executive, long continued and during a great part of the Session of the Legislature, was matter of notoriety, wherever a State newspaper was read; but the testimony is full on the subject.

Presentation was not made to the Governor "in the manner usual and customary," because there is nothing in the record to show that bills had ever been presented during a time of well known illness of the Governor, and therefore, a custom in reference to such circumstances has never been established. Mr. Ireland had no authority to present the bill; and the Secretary of the Senate could confer no such authority.

The presentation of this bill was invalid, because it was not sealed with the Great Seal of the State. Art. 3, sec. 30, of the Constitution, provides that "*Every bill*, when passed by the General Assembly, and sealed with the Great Seal, shall be presented to the Governor," &c., *i. e.*, *all bills* must be *sealed* before they are presented.

The reason for this is manifest, to wit, that the bill, when presented, shall wear the badge of authenticity, the signatures of the presiding officers, coupled with the Great Seal of the State, to testify to the Governor that the bill has come to his hands through the proper channels, and vouched by every constitutional sanction.

If fraud were intended, provided the Governor were ignorant of the hand-writing of the presiding officers, and that of the Secretary of the Senate, their names might

easily be affixed; and, if nothing more were necessary, a bill might become a law which had never actually passed the Legislature.

When the Great Seal is required to be affixed facility to commit fraud is much lessened, because the Secretary of State has custody of this seal, under Act of 1853, ch. 131, and there is little likelihood that it would get into improper hands or be surreptitiously used. Its impression would be of the highest order of verity.

*D. Claude of A.,* or the appellees.

The Secretary of the Senate had the right to delegate authority to Mr. John Ireland, the engrossing clerk, to present bills to the Governor, because the Constitution, Art. 3, sec. 30, requires that bills, when passed, shall be be presented to the Governor, but designates no one to perform such duty, nor is any one designated by law. The custodians of bills, while in the course of passage, are the presiding officers and chief clerks of the two Houses, therefore they must present them either in person or by agent, and there seems to be no reason why they should not delegate this duty to a subordinate officer, and many reasons why they should.

It is insisted by the appellant that the bill in controversy should have been sealed with the Great Seal of the State before it was presented to the Governor; and not having been so sealed, it was invalid. But the appellees claim that the Great Seal could not have been affixed to the bill before presentation to the Governor, because by the Act of 1853, ch. 131, the seal is put into the custody of the Secretary of State, and no one is allowed to affix it to any document but the Executive himself, and he is required at the same time to sign his name. This law has never been declared unconstitutional, and is on the statute books to-day, so that an officer of the Legislature, in order to affix the seal, would be compelled to do an unlawful

act, or else the Governor would be compelled to sign each bill twice—once when he puts the seal upon it before presentation, and again when approved by him after presentation. But evidently, since the granting of the veto power, this provision of the Constitution is of no avail, and it is equally evident that this section was taken bodily from the Constitutions of 1851 and 1864, and copied into the Constitution of 1867. Moreover, the section of the Constitution of 1867, which grants the veto power, and sets forth also the manner in which bills shall be presented, says nothing in regard to sealing them with the Great Seal before presentation.

The real question in the case is whether the bill in controversy is a law, or not, under sec. 17 of Art. 2, of the Constitution? Under this section, the veto power was given to the Governor for the first time in this State. It was granted, as expressed by this section, to prevent or guard against hasty or partial legislation, and encroachments by the Legislative Department upon the co-ordinate Executive and Judicial Departments. Again, when the bill has passed, it provides that it shall be presented to the Governor, who shall sign it, if he approves it; but if not, he shall return it within six days to the House in which it originated, with his objections, and the Legislature has the right to pass the bill thus returned over the veto of the Governor by a three-fifths vote of the members of each House, when it becomes a law, just as if the Executive had not objected to it. Now, this section further provides, that if the bill shall not be returned by the Governor within six days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the General Assembly shall, by adjournment, prevent its return, in which case it shall not be a law.

The bill in controversy was taken to and left at the Executive Chamber in the State House on the 24th day of

March, about two o'clock, p. m.; it was taken by Mr. Ireland, the engrossing clerk of the Senate, and left with Mr. Brooks, the messenger to the Executive, who was at that time in sole charge of the premises, and there alone. Mr. Ireland laid the bill upon the desk usually occupied by the Secretary of State, and at the same time said to Mr. Brooks: "Here are two bills for the Governor's approval or rejection; please call Mr. Briscoe's attention to them as soon as he returns, as I want the Governor to get them this afternoon."

The bills remained in the Executive Chamber from that time until the 29th, when they were taken over to the Executive Mansion, but were brought back and carried over again the next day, when the Governor saw the bill for the first time, and acknowledged the presentation of it; he afterwards, however, had the date of presentation on the back of the bill altered from the 24th to the 29th, and not to the 30th. Now, if the presentation was of the date of the 24th, the bill is now a law, under the provisions of Art. 2, sec. 17, of the Constitution, which requires a bill to be returned within six days, or else to become a law as if signed. If the presentation was of the 29th or 30th, then the bill is not a law, but has been killed by what is commonly called a pocket veto, under the provisions of that portion of this section, which says, that a bill shall be returned within six days, unless the Legislature shall, by adjournment, prevent its return. The Legislature adjourned on the 3d of April, and the six days provision therefore, would run against the bill, if presented on the 29th or 30th of March, and in favor of it, if presented on the 24th. So the gist of the case is: is a personal presentation required? We can to some extent, arrive at an answer to this question by inquiring what is the object of the veto power, and what would be the result of requiring a personal presentation?

By reference to the section granting the power, we find the object to be for the purpose of guarding against hasty

or partial legislation—in other words, to give the Executive an opportunity of calling the attention of the Legislature to any carelessly drawn, or ill-considered laws, or to any that might contain unconstitutional or injurious provisions; but not to clothe him with the power of defeating proper legislation, to which he should happen to be opposed. Again, to guard against encroachment of the Legislative upon the Executive and Judicial Departments, but not to enable the Executive to encroach upon the Legislative Department. Again, we find that the power of defeating the Executive veto, is carefully reserved to the Legislature, and that no matter how good and sufficient may be the reasons for the exercise of his veto, the Legislature can, by a three-fifths vote, pass a bill over it. Now, were a personal presentation required, the Executive by simply absenting himself, could defeat any law, however salutary; could not only encroach upon the Legislative Department, but could actually dictate all legislation, and could finally, not only do away with the three-fifths provision of the Constitution, but could exercise a power of absolute veto. Up to 1867, Maryland had no veto power in her Executive; and this is the first time that the question has ever arisen in this State, and only once before has this question arisen in the whole country, and on that occasion it was decided, that a personal presentation was not necessary or required. *Soldiers' Voting Bill,* 45 *N. H.* 611.

STONE, J., delivered the opinion of the Court.

To an application for a mandamus against William T. Hamilton, Governor of Maryland, directing him to deposit a certain bill, which had passed the General Assembly, in the office of the clerk of the Court of Appeals, and which bill the petition claimed was a law, because it was presented to the Governor more than six days before the final adjournment of the Legislature, but had neither been

vetoed nor signed by him, the Governor interposed several objections. One was that the bill had not been presented to him personally, until within the period of six days before the final adjournment of the Legislature, although it was left in the Executive Chamber more than six days before the adjournment. Another objection urged by him is that the bill was never at any time sealed with the Great Seal of the State, and that until that was done he was not required by the Constitution either to approve or to veto, and in fact was not bound to consider the bill at all.

The first of these objections raises the distinct question of the necessity of *a personal presentation* of a bill to the Governor, before he can be required to consider it; or whether a *proper delivery* in the Executive Chamber at Annapolis, although the Governor may be absent therefrom at the time, is sufficient.

This is a very important question, but one which we do not mean now to decide, because the determination of that question is not necessary to the decision of this case, and because there is a wide and irreconcilable difference of opinion among the different members of the Court on that point.

The second objection raises the question whether, in any event, a bill should not be sealed with the Great Seal before its presentation to the Governor, whether such presentation be a personal one or not; that is, whether or not it is *the constitutional duty* of the Governor to consider, for the purpose either of approval or veto, any bill presented to him without its being so sealed? On this question the members of the Court before whom this case has been re-argued, are unanimous.

It appears from the answer of the respondent in this case, his positive testimony, and from an inspection of the bill itself made by the Court below, that it was not at the time of presentation, and was not at the time of the trial below sealed with the Great Seal.

The 30th section of Art. 3, of the Constitution, uses this unequivocal language: "Every bill, when passed by the General Assembly, *and sealed with the Great Seal*, shall be presented to the Governor, who, if he approves it shall sign the same in the presence of the presiding officers, &c."

This third Article of the Constitution is the one defining the powers and duties of the Legislative Department, and nothing else is therein contained except what may be necessarily explanatory of those powers and duties. There are three things required by this section to be done in relation to bills before the duty of the General Assembly ends, and that of the Governor begins. They must pass the bill; they must seal the bill with the Great Seal of the State, and they must present the bill to the Governor, and when all this is done, and not till then, the duty of the Governor begins. All these are conditions precedent to be performed by the Legislature before his constitutional duties imperatively require the Governor to act. We cannot disregard, what, we consider, plain and unambiguous language, and substitute in its place supposed intentions, or erroneous practice.

But it is thought that sec. 17 of Art. 2, of the Constitution is inconsistent with the Article we have been considering. This is not so. This latter clause is entirely consistent with the former and does not annul any of its requirements. The second Article of the Constitution is devoted to an enumeration of the powers and duties of the Executive Department, and contains nothing else except what is necessarily connected with, and explanatory of them. The seventeenth section of it relates to the veto power, and prescribes the right and duties of the Governor *after a bill has been presented to him.* It says nothing, and intends to say nothing, of the mode and manner of presenting or authenticating bills before presentation. It leaves that in precisely the same situation that

the thirtieth section of the third Article placed it. This third Article of the Constitution, having required a bill to be sealed with the Great Seal before presentation to the Governor, it follows that the Executive has the undoubted right to refuse to consider, if he choses, any bill not so authenticated, and the bill in this case not being sealed as required, there was no proper, legal presentation of it to him more than six days before the adjournment of the Legislature, and the order of the Court below must be reversed and the petition dismissed.

> *Order reversed, and petition for*
> *mandamus dismissed.*